DowNey, Judge,
delivered the opinion of the court:
In 1916 the State of New York, in preparation for the annual encampment of its National Guard to be held in July, advertised for and received bids and entered into contracts with E. Lawrence Smith for horses and mules for the use of its troops during such encampment. The contracts were primarily on a hiring basis at a rate of $3 per day for 16 days for each animal, but they also provided for foraging by the State for 21 days, for the right to purchase at the expiration of the 16 days at stated prices, and for payment at those prices for all animals which for any reason the State should not return.
On June 18, 1916, due to the Mexican situation, the President, through the Secretary of War, instructed the Governor of New York to assemble certain units of the National Guard of that State for muster into the Federal service and other units were thereafter included.
*752 The governor complied with these instructions and the Chief of the Quartermaster Corps of the New York National Guard requested Smith to anticipate deliveries under his contracts and make same as rapidly as could be done. Smith complied with this request and commenced deliveries within a few days thereafter, the first delivery being made on June 23. Deliveries were at such stockyards as were directed by the Chief Quartermaster of the National Guard.
The commanding general of the Eastern Department of the Army, located at Governors Island, was authorized by the Adjutant General to purchase horses for the use of the militia troops of several Eastern States and the department quartermaster was authorized by the Quartermaster-General to purchase certain numbers of certain classes of animals for the New York troops at stated prices.
The commanding general of the Eastern Department appointed a number of boards of officers called “ horse boards ” to inspect and accept horses and mules and they at once became active. It was known that Smith was delivering large numbers of horses and mules under contracts he had with the State and this immediate source of supply was very naturally resorted to by the boards which were inspecting and taking over the stock necessary to supply the needs of the New York troops. It is hardly probable that these boards gave any thought to the question as to whether these horses and mules were being taken from Smith or from the State of New York. They were concerned only with getting the necessary stock and getting it quickly so that the troops might be on their way.
Smith delivered in all 4,523 animals, of which the State returned to him 2,422, and 51 of which died, leaving 2,050 not returned. The United States tendered to' Smith prepared vouchers for execution by him covering payment for 1,826 animals in the aggregate sum of $287,865, which he executed only after stipulating with the adjutant general of the State that he might accept this amount direct from the United States without prejudicing his claim against the State under his contracts. This left 224 animals, 124 horses and 100 mules, of those which we have found were taken over *753 by the United States for which the United States has not paid.
Smith sued the State under his contracts for the use of the animals delivered, their forage and for the value of those not returned, crediting against his claim the $287,865 which he had received from the United States. The findings of the referee fully sustained his claim and, based thereon, he was given judgment for $294,191.60, with certain allowances of interest which increased the amount of the judgment to $316,278.62, and the amount of this judgment was paid to him by the State. This judgment included the ascertained value at contract prices, which we have also determined to be the reasonable value, of all animals not returned, less the credit of $287,865, and therefore of necessity included the value of the 224 animals taken over by the United States and not paid for.
So far as these 224 animals are concerned the case is largely one of fact dependent for its solution on a rather voluminous record full of details and by no means free from complications. It is not strange that apparent discrepancies in accounting should appear in a transaction conducted as was this under the stress of an emergency and with many different “ horse boards ” operating day and night at' different localities. Rather is it strange that in the midst of all these complications the conclusion may finally be so satisfactorily reached. The 124 horses are claimed for as artillery horses and upon the question of their classification the record is not entirely satisfactory. There is basis for the claim as made but the better sustained conclusion seems to be that they were cavalry horses and we have so found.
Passing the determined question as to whether the United States got these 224 animals for which it did not pay, we find it contended that all animals taken over by the United States were taken from Smith and that the State has therefore no right to recover. The fact that Smith signed vouchers for 1,826 animals and received payment therefor of $287,865 from the United States is strongly urged. The facts appear in the findings and to us they seem to sustain a different conclusion. They indicate clearly as do all other *754 facts bearing at all on the question that Smith regarded himself at all times as dealing with the State under his contracts. There was a large sum of money involved and he no doubt wanted to be paid what was due him but when informed that Government vouchers were ready for his signature on which he could obtain a considerable payment he refrained from signing these vouchers until he had taken the matter up with the State authorities and been assured that he might receive this payment and credit it on his claim without prejudicing his rights under his contracts with the State.
It is not to be contended that there was such a delivery of these animals to the State as vested ownership but the ultimate effect so far as liability is concerned was the same. There was delivery under direction of the chief quartermaster of the State for the use of the State under contracts which obligated the State to pay for such animals as it did not return. The State was in the first instance but a bailee obligated to pay an agreed hire but when it failed to return the property liability for its agreed value attached. And when the United States took the property and thus imposed on the State the obligation to pay for it the United States in turn became liable to the State for the value of the property. But aside from any academic discussion of the question the fact remains that the State has been required by the judgment of a competent tribunal to pay for the property in question, and even though we may not be bound by the findings in that case it is an adjudication which should at least go far in determining who may now sue the United States for property it has received and has not paid for. That suit, the judgment and its payment would certainly estop Smith from asserting any claim against the United States on account of the property in question and relieve the situation from the possibility of adverse claimants.
The plaintiff asserts as the values of the animals in question the values which we have found, being the same as the prices provided in its contracts, plus $48 as to each animal, the claim as thus made being predicated on the contract provision for the payment of $3 per day for 16 days for the use of each animal. We can not adopt this theory of values as *755 a basis of recovery because it necessarily involves the untenable theory that the United States assumed the obligation of the State to pay for the contemplated use of the animals. This theory was in effect disposed of by the court when, upon consideration of a-demurrer to the amended petition in which claim was asserted for the “ rental of 4,523 animals for 16 days at $3 per day per animal constituting a portion of the purchase price and value of said animals taken over by the United States,” it was concluded that no recovery could be had on the claim for rental and that under section 165 of the Judicial Code the taking of testimony on that item should not be authorized. That item included the rental of all animals furnished by Smith under his contracts and therefore includes this element of the present asserted values.
An item of the present claim stated as “ Balance due on animals for which partial payments were made, 1,826 at $48 additional each, $87,648.00 ” scarcely needs discussion in view of what has been said. The payments referred to as “ partial ” are the payments for 1,826 animals made to Smith as shown in Finding IX. Aside from other considerations it is difficult to justify characterizing these payments as “ partial.”
The claim otherwise is for the two items of $26,132.70 and $4,599.98, referred to in Finding XI. These two items were both included in Smith’s recovery against the State, but they embraced expenses incurred, in relation to the whole number of animals delivered by Smith under his contracts for which there is no apparent liability on the part of the United States. If any portion of such expense was incurred in relation to the animals taken over by the United States after they were taken over, the facts might furnish a possible basis of liability, but they do not appear.
We have directed judgment for the determined value of the 224 animals taken by the United States and not paid for, which we conclude is the limit of liability.
Gkaham, Judge; Hat, Judge; Booth, Judge; and Campbell, Chief Justice, concur.